UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BARBARA BRANKS,

v.                                    Case No. 8:09-cr-431-T-33TGW
                                      8:11-cv-438-T-33TGW

UNITED STATES OF AMERICA.

_____

O R D E R

This cause is before the Court on Barbara Branks' timely-filed motion to vacate, set

aside, or correct an allegedly illegal sentence pursuant to 28 U.S.C. § 2255 (hereinafter

"motion to vacate" or "motion").  (Doc. cv-1; cr-29). Branks is represented by retained

counsel T. Federico Bower.

A review of the record demonstrates that, for the following reasons, the motion to

vacate must be **denied**.

**PROCEDURAL BACKGROUND**

Prior to her indictment in September 2009, Branks retained Attorney Bryant R.

Camareno to represent her.  (Docs. cr-1, cr-3; Doc. cv-15 at 12). On November 17, 2009,

Branks, pursuant to a written plea agreement, pled guilty to count one of an indictment

charging her with conspiring to commit visa fraud by making false statements, misusing

visas, permits, and other documents, in violation of 18 U.S.C. § § 371, 1001, and 1546(a).

(Docs. cr-8, cr-16, cr-18, cr-31).

# FACTUAL BACKGROUND

The factual basis of the indictment is set out in the plea agreement:

The Bureau of Immigration and Customs Enforcement ("ICE") Office of the Special Agent in Charge, Tampa, Florida, conducted an investigation into La Gringa Professional Immigration Services, LLC ("La Gringa") and specifically into the president of the company, Barbara Branks. ICE had received information indicating that La Gringa's president Barbara Branks, and her employees were involved in immigration benefit fraud.  The initial investigation pointed to the fact that Barbara Branks and others were preparing fraudulent documents and fraudulent applications in support of petitions before immigration authorities for individuals that were ineligible to obtain immigration benefits.

A random review of several asylum applications prepared and notarized by Branks revealed factually identical asylum claims of persecution from Venezuela and Columbian nationals involving different individuals from different locations. In addition, extensive packets of supporting documents, to include medical documents and letters from political parties, were submitted with each application. These documents also contained similarities in their style, language and substance.  Moreover, the volume of medical documentation received in cases prepared by La Gringa appeared to be in extreme excess of what would routinely be submitted for legitimate claims involving nationals of the same countries prepared by other individuals.  The investigation revealed that the majority of documents in Spanish were translated into English by Daniella Lagassey and were notarized by Branks.

A joint investigation was undertaken by Miami Asylum Fraud Prevention with USCIS Fraud Detection Unit and a random sampling of 21 cases submitted by Barbara Branks and La Gringa were sent to the Forensic Document Laboratory ("FDL") for a common source between documents used in different cases and prepared by Branks.  Initially, the FDL responded to fourteen of the cases sent. Of the fourteen, all of the cases contained documents that were deemed to be fabricated or "not what they are purported to be."  Of the fourteen, twelve cases had documents which were forensically linked and determined to have been generated from the same color copier. The forensic analysis indicated that although the individuals seeking asylum in the different case files came from different countries and presented supporting documents that were supposed to have come from different parts of Columbia and Venezuela, in fact, all of the documents, represented to be originals, were produced in the United States from a common source.

All of the files alluded to in the "Overt Acts" section of the indictment

have been analyzed and their alleged supporting facts investigated. The investigation has revealed that all of the aforementioned files contain counterfeited and fraudulent supporting documents and false factual allegations and statements pertaining to material facts, which were remade under penalty of perjury.

Based on the information received during the early stages of the investigation, a federal search warrant was obtained to search the offices of La Gringa. On June 12, 2009, ICE Special Agents executed a federal search warrant at the office of La Gringa Professional Immigration Services, LLC located at 2135 Drew Street, Clearwater.

The investigation revealed that La Gringa was incorporated in the State of Florida in approximately March 2001. Barbara Branks is the President of La Gringa. The business prepared many types of immigration applications, petitions, and other documents needed for persons to submit to the United States Citizenship and Immigration Services ("USCIS"). These included Petition for Alien Relatives, Application to Adjust Status, Petitions for Legal Residencies, Petitions for Removal of Conditions of Residency, Asylum Petitions, and Visa applications, among others.

The investigation revealed that approximately one month prior to the date of the execution of the search warrant, Barbara Branks discovered that she was under criminal investigation by ICE. As a result, Branks contacted Copier Strategies, Inc., and traded the Ricoh MPC2500 she had been using in the creation of fraudulent documents for a different black and white copier/printer. Branks took this action to make it harder for USCIS to detect fraudulently made supporting documents and to detach herself from one of the instrumentalities used in the illegal activities. She also started to return file folders to clients so she could divest herself of their possession.

Barbara Branks also got rid of a stamp that had been used on [sic] the preparation of fraudulent documentation. The stamp had the inscription "Accion Democratica" and was repeatedly used in the creation of false documents. Multiple documents analyzed by the Forensic Document Laboratory and determined to be fraudulent, were stamped with the aforementioned "Accion Democratica" stamp. The investigation further revealed that Branks deleted fraudulent document templates from one of the computers at the La Gringa office.

The investigation revealed that Branks' clients knew the documents were fraudulent, but the clients did not directly participate in their fabrication. Clients would discuss items such as hospital names and cities. Daniela Aizpurua would then make the fraudulent documents. Branks would direct Daniela Aizpurua to make documentation, such a medical documentation,

3

when a client was not able to provide the required documentation. Daniela Aizpurua would use a computer to make the documentation. Because Daniela Aizpurua was fluent in Spanish, she would create the documentation in Spanish. Daniela Aizpurua would use templates that were set up on the computer located on the reception desk computer. Further, Daniela was fluent in Spanish and English and would translate the documents into English. Then, she would print both documents on the Ricoh color copier/printer. This copier/printer has been identified by the Forensic Document Laboratory and the Secret Service as the source of the fraudulent documents in this case.

Once the clients [sic] applications were completed, Branks would go over the application and forms with the clients. The clients or Daniela would sign the fraudulent documents. Branks would notarize the translations of the fraudulent documents. Daniela stamped the fraudulent documents with fraudulent stamps. The clients were aware that there were fraudulent documents in their applications/petitions to USCIS. Branks would then direct Sagrario Aizpurua, who knew the fraudulent nature of the documents, to mail the applications/petitions to USCIS and to assist in other related matters. A few times, Branks recommended illegal aliens to marry a U.S. citizen for the exclusive purpose of obtaining immigration benefits and circumventing immigration laws. In some cases, Branks' acting as a notary public, married several individuals she knew were only marrying for an immigration benefit. She would then assist them in the filing of Petitions before immigration authorities based on the fraudulent marriage.

During times relevant to the conspiracy, Barbara Branks and others filed and caused to be filed, before immigration authorities, in excess of 1,800 petitions of different kinds. It is estimated that approximately 272 of those were petitions for asylum. Defendant Barbara Branks would charge approximately $3,000 for each. It is estimated that the defendant charged approximately a total of $816,000 for the asylum applications during her tenure as president of La Gringa Immigration Services. The investigation has revealed that most, if not all, of the applications for asylum were fraudulently made. Because of the pervasive nature of the fraudulent activities discovered at La Gringa Professional Immigration Services, the United States Department of Homeland Security has to reopen and revisit all cases involving the filing of petitions of individuals that were clients of La Gringa Professional Immigration Services. This has caused a significant disruption of the governmental functions of the agency.

(Doc. cr-8 at 14-19).

## BRANKS' CHANGE OF PLEA HEARING

4

At her change of plea hearing on November 17, 2009 (Doc. cr-16, [transcript at cr-31]),  Branks confirmed that she had a "full and complete" opportunity to speak with her counsel prior to deciding to plead guilty. (Doc. cr-31 at 4). Magistrate Judge Thomas G. Wilson, who conducted the change of plea hearing, inquired into Branks' age, education, and her ability to understand the plea proceedings. (Doc. cr-31 at 18-20). The Court "summarize[d] virtually all of the overt acts," in addition to reading the introduction and remainder of the indictment to Branks. (Doc. cr-31 at 5-11). The Court noted:

> The elements of this offense are set out in paragraph three, which is on page two. And that indicates that the charge in the indictment is what is known as a conspiracy charge. And what the government must prove, and they must prove it beyond a reasonable doubt, is that two or more people had a plan or an agreement or an understanding to do something that was against the law.
>
> And in particular what they must prove, because this is what they've charged, is that there was a plan or an agreement or an understanding between two or more people to either knowingly make false statements under oath -- related to a material matter within the jurisdiction of an agency of the United States.  They're sort of very similar charges, but they have to show that the plan or agreement or understanding related to at least one of those two matters alleged there in the indictment.

(Doc. cr-31 at 5, 12-13).

In reviewing the facts stated in the plea agreement (Doc. cr-8 at 15-19), the Court asked whether there were any facts in dispute. (Doc. cr-31 at 14). Branks' counsel replied:

> Judge, I'll speak as to that. And I spoke to Mr. Toro-Font about this a couple of weeks ago. The factual basis, Judge, for the most part, no objection. The in excess of 18 petitions, Judge, she's relying on memory. She doesn't know the exact number.
>
> The amount -- the fee on page 19, some applications did cost the immigrant applicant 13 -- I'm sorry, 3,000. Other times  it was less than that. The forfeiture amount of 816,000, again, she -- she's relying on good faith representations by the government's estimate -- estimation.

But for the most part, Judge, she has no dispute. But as this is her first foray into the criminal system, Judge, she wants to make sure that Your Honor doesn't think that she's misleading the Court by saying that, yes, she agrees with that, but she's just relying on her memory and the representations made by the government.

(Doc. cr-31 at 13-14).

The Court and both counsel acknowledged that the number of petitions and the forfeiture amount would be sentencing issues. (Doc. cr-31 at 15). Branks agreed this was also her understanding. (Doc. cr-31 at 15). The Court reviewed the facts as to how Branks' business operated in preparing the asylum applications and Branks agreed to these facts. (Doc. cr-31 at 15-18). Branks clarified that the "majority of the falsification to the asylum petitions" concerned the medical documentation and she admitted she knew these were false documents and that other people were involved in this process. (Doc. cr-31 at 17).

Branks confirmed that her attorney had reviewed the indictment with her, in detail. (Doc. cr-31 at  5). Branks stated that she understood the charges to which she was pleading guilty and that she had an opportunity to review in detail the indictment and plea agreement with her attorney before the change of plea hearing. (Doc. cr-31 at 5, 11-14, 36). Branks told the Court she had read the plea agreement herself and understood the charges. (Doc. cr-31 at 18-19, 23).

The Court reminded Branks of the penalties set out in the plea agreement and advised her that the maximum penalty for her charge was five years imprisonment. (Doc. cr-31 at  23-24). Branks agreed this was her understanding of the sentence she could receive and had no further questions. (Doc. cr-31 at 24-25). The Court reminded her that the District Court Judge would determine her sentence, forfeiture amount, and guidelines range. (Doc. cr-31 at 25- 27, 32-34). Branks confirmed she understood. (Doc. cr-31 at 32-

6

34).

In reviewing the benefits Branks was receiving pursuant to the plea agreement, the Court reviewed the substantial assistance provision.  (Doc. cr-31 at  27-32).  The Court specifically told Branks that any cooperative efforts on her part would be considered, but that there was no promise she would receive such a benefit. (Doc. cr-31 at 29-30).  As part of her plea agreement, Branks expressly waived the right to appeal her sentence, "or to challenge it collaterally on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines . . . ." (Doc. cr-8 at 12-13).

The Court reviewed the appeal waiver and the rights Branks was waiving by pleading guilty, as well as the consequences of waiving her rights, such as trial by jury. She confirmed that she understood the consequences of electing to waive those rights. (Doc. cr-31 at 20-34). Part of the waiver would include Branks' giving up her right to challenge the government's evidence and giving up her right to put on a defense to the charges. (Doc. cr-31 at 21-22). Branks agreed she understood she could not later "rais[e] the contention I didn't know it or this didn't happen or anything." (Doc. cr-31 at 22).

Branks confirmed that no one had forced or coerced her into entering her plea, and that she was entering the plea of her own free will. (Doc. cr-31 at 34-35). She agreed that no other promises had been made other than those in the plea agreement. (Doc. cr-31 at at 34). Branks confirmed the answers she had given the Court were the truth. (Doc. cr-36) She confirmed that she was satisfied with her attorney as well as the advice and representation she had received and had no further questions. (Doc. cr-31 at 23, 37).

In accepting her plea, the Court found that Branks was fully competent and capable

of entering an informed plea; that she was aware of the nature of the charges and consequences of her plea; and that she was "pleading guilty freely, voluntarily and knowingly with the advice of a lawyer with whom you say you are satisfied." (Doc. cr-31 at 37-38).

## PRESENTENCE REPORT AND SENTENCING MEMORANDUM

Prior to sentencing, a presentence report was prepared using the November 2009 edition of the Guidelines Manual. (Presentence Report ["PSR"] ¶ 22). Branks' sentencing memorandum advocated home confinement rather than imprisonment based on her role in the offense; her view that she did not obstruct justice; and various sentencing factors. (Doc. cr-24 at 8). Branks met with the case agents twice to debrief. (Doc. cr-24 at 3; Doc. cv-15 at 12). At sentencing, the Court noted the timely-filed sentencing memorandum and the letters in support of Branks. (Doc. cr-33 at 3).

## SENTENCING HEARING

Branks' sentencing hearing was held March 2, 2010. (Doc. cr-25, [transcript at cr-33]). The Court ensured that Branks had reviewed and discussed the PSR with her counsel, and agreed that it was factually correct. (Doc. cr-33 at 5). Branks objected to her role and obstruction of justice enhancements. (PSR Addendum dated February 23, 2010); (PSR ¶¶ 8, 19, 29, 30); (Doc. cr- 33 at 6-12, 19-20). In overruling Branks' objections, the Court took special note of the lasting harm her actions caused. (Doc. cr-33 at 14-15, 20-21). The Court adopted the undisputed factual statements and advisory guidelines range of 46 to 57 months incarceration. (Doc. cr-33 at 20-21). At no time did Branks indicate that any questions remained that her attorney could not answer, nor did she express dissatisfaction with her attorney's efforts in representing her. (See generally Doc

8

cr-33).

The government moved the Court to sentence Branks to the statutory five-year limit based on the 272 asylum petitions; other fraudulent activity in submitting applications; the severe hardship suffered by the Department of Homeland Security and immigration law judges in reviewing for accuracy the petitions she prepared; and the compensation Branks charged for her services. (Doc. cr-33 at 22-25). The Court took notice that Branks' motivation was "for the money."  (Doc. cr-33 at 25). The government also urged the Court to consider the victimization of the applicants, both financially and "because Branks' fraudulent actions would further deny them citizenship relief." (Doc. cr-33 at 25-26).  The government further argued for a high-end sentence of 51 to 63 months imprisonment because Branks believed that her actions were justified and because a longer sentence would deter further criminal conduct and protect the public. (Doc. cr-33 at at 26-27).

Branks moved for a variance on the grounds that the compensation she received "went back into her business"; some of the victims shared in the blame for the submission of false information; she believed her actions were justified; and not all of the submissions were fraudulent. (Doc. cr-33 at 29-34). Counsel argued that Branks' decision to plead guilty with a plea agreement demonstrated acceptance of responsibility because of her belief that "[s]he acted in good faith." (Doc. cr-33 at 34-35). Counsel urged the Court to note Branks' supporters and her belief that she "wanted to help people."  He also advocated that her lack of criminal history attested to her "unlikehood of re-offending." (Doc. cr-33 at 36-38).

The Court indicated it did not believe Branks' explanations warranted a variance:

> **THE COURT**: Mr. Camareno, with all due respect, those situations are very different. I mean, they're really different situations. It's like a -- comparing, you know, the low man on the totem pole, you know, a mail

carrier, or somebody who works in the mail room of a company to the president of the company. That's how I would compare the two situations, particularly when we look at the issue of -- of financial gain here.

I was taken aback when I reminded myself what that order of forfeiture was for $816,000. Now, she may not have that money anymore, but neither do most people who make money in this fashion or illegally, the money's long gone.

(Doc. cr-33 at 39-40).

Branks' counsel stressed the legitimacy of most of the applications except for the

supporting documentation. (Doc. cr-33 at 40-41).   The Court disagreed:

**THE COURT**: No, that's -- that's  aside I -- I just mention that because it's a significant amount of money.   No, what's at the heart of this, Mr. Camareno, is the cheating.

**MR. CAMARENO**: Hum-hum.

**THE COURT**: And I think the reason why Mr.Toro-Font is asking me to exceed the guidelines, or at least his reasons that res[o]nate with me are, number one, the price that we as a society pay when somebody cheats the system.

Whatever the cheating may be, whether it's cheating on income taxes, whether it's cheating on Social Security, whether it's cheating on immigration. We all pay a price --

**MR. CAMARENO**: Right.

**THE COURT**: -- when somebody decides to cheat, as a society.

Number two, the people themselves who have been hurt. You know, the people who thought that they would have a  legitimate basis maybe for staying here in the United States, and Mrs. Branks, you know, purported to help them out. And now their chances of staying here, even if they perhaps had a chance of staying here legally, those chances have -- have gone out the window. They have to go back to square one, and their lives are being disrupted significantly.

Number three, the costs to the Government. You know, Homeland Security has had to devote substantial hours to this. And I just go back to the letter of the Director of the Miami Asylum Office, it's the -- the amount of time

that people from that agency have had to spend and will continue to spend on this.

And -- and then finally, it's those people who, because they did follow the rules, and probably that's the one that, quite frankly, bothers me the most, is somebody who tries to follow the rules, and I really have lived my life trying my very best to follow the rules, as somebody who does follow the rules and believe in following the rules, I wouldn't jump to the front of the line, as much as citizenship would mean to me.

And as -- you know, as the daughter of somebody who became an American citizen, I know how -- how much citizenship means, and as somebody who presides at naturalization ceremonies, I -- I can tell you, I walk out of there with my eyes welling with tears. It's hard not to have that happen. It's -- it's a precious and wonderful gift.

And those of us who came from other countries realize what a precious gift that is more than anybody else. But when you have somebody who cuts to the head of the line, that penalizes those who have, you know, paid their dues and waited their time, and now they're being penalized because of that.

(Doc. cr-33 at 41-43).

Branks' counsel continued to minimize her role in the conspiracy by placing a significant amount of blame on Branks' former clients' complicity in the fraudulent scheme. (Doc. cr-33 at 43-44). Several witnesses and former clients spoke on Branks' behalf. (Doc. cr-33 at 45-55). Branks spoke, claiming remorse for her actions and asking the Court to take into account her family circumstances, her good intentions, and hard work. (Doc. cr-33 at 55-68). This Court remarked it had "never seen the courtroom filled with so many people." (Doc. cr-33 at 48). Branks' counsel asked the Court to note her success at raising a family. He argued that her crimes were not for financial gain and that her incarceration costs would outweigh the benefit of Branks' continuing to work. He also argued that there was a lack of programs in prison for her situation. (Doc. cr-33 at 68-69).

The Court sentenced Branks to 57 months incarceration. (Doc. cr-33 at 70-71). The

Court explained its reasoning for the sentence. (Doc. cr-33 at 72-75).

Branks did not directly appeal her conviction or sentence. Branks timely filed the present motion to vacate on March 2, 2010, raising several claims of ineffective assistance of counsel.

## STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Claims that counsel was ineffective can be raised for the first time in a § 2255 petition. *Massaro v. United States*, 538 U.S. 500, 504 (2003). To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

The two-pronged Strickland test is applicable to ineffective assistance of counsel claims arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). As applied to the plea situation, the first prong of *Strickland* remains the same in that the attorney's conduct must fall within the range of reasonable conduct. *Hill,* 474 U.S. at 58. Counsel owes a lesser duty to a client who pleads guilty than to one who goes to trial, however, and in the former case, counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between entering a guilty plea and going to trial. *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). To impart such an understanding to the accused, counsel merely must make an independent examination of the facts, circumstances, pleadings and laws

involved, and then offer counsel's informed opinion as to the best course to be followed in protecting the interests of the client. *Id.*

The second prong of the *Strickland* test focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Hill,* 474 U.S. at 59. In other words, in order to satisfy the prejudice requirement, a defendant claiming ineffective assistance of counsel during the plea process must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. *Id.*  However, a simple statement to that effect is insufficient.  Rather, in *Hill*, the Supreme Court suggested courts must conduct their own inquiries:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59.

The best way to evaluate whether there is a reasonable probability a petitioner would have insisted on going to trial is to determine whether petitioner had available a defense that would likely have borne fruit at trial. *Upshaw v. United States*, 2008 WL 638261 at *1 (M.D. Fla., Mar. 5, 2008) (citing *Hill v. Lockhart*, 474 U.S. 52, 59).

**ATTACK ON GUILTY PLEAS IS LIMITED**

Because the need for finality has "special force with respect to convictions based on guilty pleas, a guilty plea may be attacked on collateral review only in strictly limited circumstances." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal citations omitted). In particular, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984). Thus, when a defendant files a Section 2255 motion to challenge the validity of a conviction pursuant to a guilty plea, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989).

The district court has three "core concerns" regarding a Rule 11 plea colloquy: (1) ensure that the guilty plea is free of coercion; (2) ensure that the defendant understands the nature of the charges against him; and (3) ensure that the defendant is aware of the direct consequences of the guilty plea. *United States v. Monroe*, 353 F.3d 1346, 1354 (11th Cir. 2003). Rule 11 of the Federal Rules of Criminal Procedure explicitly directs the district court not to accept a plea without determining these core concerns. See Fed. R. Crim. P. 11(b).

In the present case, the change of plea colloquy confirms that Branks' guilty plea was knowing and voluntary. Branks was advised of the charges to which she was pleading, the penalties she was facing, the rights she was waiving, and the elements of the offense. Under oath, Branks said she understood (1) the charges and penalties; (2) the consequences of the rights she was giving up; (3) the benefits the plea agreement afforded her; (4) how the Court would fashion her sentence; (5) she was not promised anything, except for what was in the plea agreement, or forced or tricked in any way, in order to plea

14

guilty; and (6) she was satisfied with her lawyer. Branks also confirmed she had read the plea agreement, understood it, and nothing concerning the plea confused her. (Doc. cr-31 at 11-12, 18-19, 23, 37). Branks agreed with the factual basis used to support the plea and admitted that she and others were part of a conspiracy involving in excess of 1800 immigration petitions, and the majority of these petitions were fraudulently filed, including approximately 272 asylum petitions. Branks agreed with the factual basis of the plea and did not object to any of the stated facts.

Before the plea was accepted, Branks was given an opportunity to place any additional concerns on the record or to raise any questions concerning the case or her plea but she indicated she was satisfied and still wished to plead guilty. Thereafter, the Court determined that Branks was entering a knowing and voluntary plea with a clear understanding of the charges, penalties, and rights she was giving up.

This Court is permitted to make a strong presumption of truth regarding statements made by a defendant during a plea colloquy. *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994); *United States v. Gonzalez-Mercado*, 808 F.2d 796, 800-01 n.8 (11th Cir. 1987). Branks has not offered any sound reason to disregard her sworn statements during the plea colloquy. *See United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988) (defendant bears heavy burden to show statements under oath at plea colloquy were false).

## DISCUSSION

## Ground One

Petitioner's trial counsel failed to review the terms of her plea agreement with her. More Specifically, Petitioner's trial counsel failed to explain that as part of her plea agreement she was waiving her appellate rights and her right to collaterally attack her sentence. Had Petitioner known that she was giving up these valuable rights she would not have pled guilty and instead would have gone to trial. As such, Petitioner's trial counsel was ineffective for failing to go over the plea agreement with her and explain that she was waiving her appellate rights as well as her right to collaterally attack her sentence, and Petitioner was overwhelmingly prejudiced as it resulted in the involuntary waiver of her appellate and post-conviction rights. Consequently, Petitioner is entitled to have her plea vacated, or in the alternative, to the reinstatement of her Appellate rights and to have all of the challenges to her plea and sentence brought within this motion to be fully and fairly reviewed by this Court.

Branks did not state any facts to support these claims on the 28 U.S.C. § 2255 form.

In her memorandum of law, Branks alleges, in support of ground one:

For a sentence-appeal waiver containing express language waiving the right to attack a sentence collaterally to be enforceable, it must be entered into knowingly and voluntarily. See, *Thompson v. United States,* 353 F. App'x 234, 235 (11th Cir. 2009). In the context of an ineffective assistance of counsel claim, prejudice is presumed if "the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affect his lawyer's performance." *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 (internal quotations and citations omitted).

Here, Ms. Branks' trial counsel advised her to enter into a plea agreement with the government in which she agreed to waive her right to collaterally challenge her sentence. In doing so, Ms. Branks' trial counsel actively represented conflicting interests, as trial counsel represented: (1) Ms. Branks and her interest in obtaining a favorable plea deal, as well as, (2) trial counsel's own self-interest in having Ms. Branks waive her ability to collaterally attack his representation of Ms. Branks with respect to her sentencing. As such, because Ms. Branks' trial counsel's interest with respect to her waiver of her right to collaterally attack her sentence was adverse to Ms. Branks' interest, and Ms. Branks entered into the plea agreement containing the waiver upon the advice of same counsel who had a clear conflict of interest with respect to said waiver, the waiver was not knowingly and voluntarily entered into and should be nullified. Furthermore, Ms. Branks submits that in order for said waiver to have been entered into knowingly and voluntarily, Ms. Branks would have had to have first, been aware of the conflict, and second consulted with disinterested counsel with respect to said waiver, or in the alternative, have been advised to seek disinterested

counsel's advice with respect to said waiver.   As neither of the aforementioned took place, Ms. Branks submits that the waiver of her right to collaterally attack her sentence was not knowingly and voluntarily entered.

Consequently, because the collateral attack waiver contained with Ms. Branks' plea agreement was not knowingly and voluntarily entered, Ms. Branks should be permitted to collaterally challenge her sentence, per *Thompson, supra; Strickland, supra.*

(Doc. cv-15 at 7-8).

## No Conflict of Interest Existed

Counsel's duty to advise Branks fully about the consequences of her guilty plea, including the waiver of ineffective assistance of counsel claims, does not inherently create a conflict of interest. The Eleventh Circuit recognizes that the waiver might not bar a "claim of ineffective assistance in entering or negotiating the plea [or] a claim challenging the validity of the plea or agreement." *Williams v. United States*, 396 F.3d 1340, 1342 n.2 (11th Cir. 2005).

Nothing in her plea agreement leaves Branks without recourse to challenge her conviction, the voluntariness of her plea, or a perceived constitutional defect. *United States v. Broce,* 488 U.S. 563, 569 (1989). However, controlling Eleventh Circuit precedent upholds knowing and voluntary sentence appeal waivers such as Branks' appeal waiver. *United States v. Buchanan,* 131 F.3d 1005, 1008 (11th Cir. 1997);   *United States v. Bushert,* 997 F.2d 1343, 1353 (11th Cir. 1993). Branks' conclusory statements fail to show an actual conflict of interest existed or that any such alleged conflict of interest adversely affected counsel's performance.

"Where an ineffective assistance claim is based on a conflict of interest, 'a defendant must show, first, that his attorney had an actual conflict of interest, and second, that the conflict adversely affected counsel's performance.'" *Singletary v. United States*, No.

2:07-cv-611-FTM-33SPC, 2009 WL 2765657, at *4 (M.D. Fla. Aug. 27, 2009) (citation omitted). Branks cannot "point to specific instances in the record to suggest an actual conflict or impairment of [her] interests" exists. *Id.* Branks chose to plead guilty pursuant to a written plea agreement because she wanted to obtain the benefit of having her sentence reduced based on cooperation. Unfortunately for Branks, during her "two proffers [she] made several admissions but would still excuse or minimize her involvement" in the conspiracy. (Doc. cv-15 at 12). Recasting her challenge to her sentence as an ineffective assistance of counsel claim is an attempt to elude the waiver provisions of the plea agreement and does not establish that a conflict of interest actually existed or that her counsel's advice was contrary to her interests.

Courts have approved of and enforced sentence appeal waivers for almost twenty years. They are enforceable, however, only if the district court clearly spells out to the defendant what rights the defendant is going to be giving up. *See United States v. Smith,* 654 F.3d 1263, 1266 (11th Cir. 2011) ("We have consistently enforced appeal waivers, according to their terms, where the district court 'specifically questioned [the defendant] during the plea colloquy about the appeal waiver, adequately explained the significance of the appeal waiver, and confirmed that [the defendant] understood the full significance of the appeal waiver.' ").

The Federal Rules of Criminal Procedure have been amended to expressly recognize the use of sentence appeal waivers and to require that "the court must inform the defendant of, and determine that the defendant understands, . . . the terms of any plea agreement provision waiving the right to appeal or to collaterally attack the sentence." Fed. R. Crim. P. 11(b)(1)(N).

18

Lawyers regularly advise their clients to plead guilty and that decision alone surrenders many rights, most notably the constitutional right to trial by jury. A defendant's agreement to forgo his statutory right to appeal his sentence is simply another step in that plea bargaining process: "an appeal waiver is of value to a defendant 'because it is another chip the defendant can bring to the bargaining table and trade for additional concessions from the government.'" *United States v. Smith*, 654 F.3d at 1266. "Bargains have to benefit both parties or there will be nothing to bargain about." *Id.*

Branks' admissions under oath to a judge during the Rule 11 change of plea hearing shows she read and understood her plea agreement. At the hearing, Branks did not raise any questions regarding the waiver provision. The Court thoroughly reviewed with Branks the rights she was relinquishing and the benefits she was receiving by entering into the agreement. Branks' decision to resolve her federal criminal charges by agreement was made with as much finality as the law allows. Branks' current complaints merely attest to her dissatisfaction with her sentence rather than demonstrate that her counsel's advice was in conflict with her interests and simply fails to show that an actual conflict of interest existed.

A defendant who alleges ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Branks' plea was informed, knowing, and voluntary. Branks' claim "that a significant number of the [total] petitions" were legitimate is contrary to the facts she agreed were true under oath -- that "most, if not all, of the applications for asylum were fraudulently made." This claim does not reasonably demonstrate the likelihood of success at trial. Accordingly, Branks fails to demonstrate that

19

she suffered prejudice and fails to show that counsel was ineffective.

Ground one does not warrant relief.

### GROUND TWO

Petitioner's trial counsel was ineffective for failing to present over forty letters of support written to the Court by Petitioner's friends and family as mitigating evidence. Additionally, Petitioner's trial counsel was ineffective for failing to review the discovery in Petitioner's case with Petitioner. Had trial counsel reviewed discovery with Petitioner, Petitioner would have explained which documents the government was claiming were fraudulently produced were in fact legitimate. This would have in turn allowed trial counsel to contest and reduce the number of fraudulently produced documents Petitioner was held responsible for and should have been used a mitigating evidence at Petitioner's sentencing hearing. As such, there is a reasonable probability that had trial counsel reviewed discovery in Petitioner's case and presented said mitigating evidence that Petitioner would have received a lower sentence. Petitioner's trial counsel was ineffective for failing to review discovery with her and for failing to present said mitigating evidence to the Court, and Petitioner was overwhelmingly prejudiced by trial counsel's ineffectiveness as there is a reasonable probability that trial counsel's deficient performance resulted in Petitioner [sic] receiving a longer sentence than she otherwise would have received. As such, Petitioner is entitled to a resentencing.

Branks does not allege any facts in support of this ground in her motion to vacate.

In the memorandum in support of the motion, she contends:

Here, in Ms. Branks' presentence report, the probation office asserted that Ms. Branks processed in excess of 1,800 petitions which included 274 [sic] asylum petitions. Had trial counsel reviewed the discovery with Ms. Branks, he could have then produced evidence to the Court that would have significantly reduced the number of petitions Ms. Branks was held responsible for fraudulently producing, which in turn, would have resulted in a lower advisory sentencing guideline range, which in turn, may have led to the Court [sic] imposing a lighter sentence upon Ms. Branks.

Because it was unreasonable for trial counsel not to review discovery with Ms. Branks, Ms. Branks' trial counsel's performance was deficient. Further, Ms. Branks was prejudiced by her trial counsel's deficient performance as had trial counsel reviewed discovery with her, trial counsel could have presented a more accurate representation of the scale of the fraudulent conduct Ms. Branks' actually engaged in, which may have in turn

> led to Ms. Branks receiving a lighter sentence. Consequently, Ms. Branks is
> entitled to a resentencing.

(Doc. cv-15 at 8, 9).

This claim has no merit. There is not any misunderstanding about the scope of Branks' conspiracy and the resultant harm she caused. At sentencing, counsel did produce witnesses and submit letters attesting to the legitimacy of some of the petitions. Nothing in the record demonstrates that a greater number of witnesses would have swayed this Court to grant further leniency. Review of counsel's conduct is to be highly deferential, and second-guessing of an attorney's performance is not permitted. *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992); *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992). Courts should presume counsel was effective. *Atkins*, 965 F.2d at 958. Because counsel's performance may fall within a "wide range" and be considered constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Branks' crime centers on her circumventing the immigration process through the creation of fraudulent documentation causing lasting effects on her clients and the immigration authorities. The factual basis of her plea agreement recognized that some of her petitions were legitimate, a fact this Court recognized in crafting her sentence. As she affirmed on the record during his change of plea hearing, Branks entered her plea after ample consultation with informed and competent counsel. Branks has supplied no basis upon which this Court may find that counsel's performance was deficient under *Strickland*. Thus, Branks cannot show prejudice on the basis she claims.

Defense counsel must conduct a reasonable investigation. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *see Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (en banc) ("[C]ounsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance."). Here, there is ample evidence that Branks' counsel did review discovery and confer with his client, and then made a strategic decision to rely on his sentencing memorandum and accompanying letters of support along mitigation argument at the sentencing hearing.   Counsel arguments centered on Branks' prior good deeds.   He presented several witnesses able to show Branks' character and work on legitimate petitions. It is not unreasonable to believe that Branks participated in the process of attaining the letters of support and witnesses. "[T]he scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions." *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009), *cert. denied*, 131 S.Ct. 173 (2010).   *See also*, *Johnson v. Upton*, 615 F.3d 1318 (11th Cir. 2010)(The defendant himself is responsible if he is, for example, the primary source for mitigation evidence but simply fails to disclose it, or inhibits development of it.).

Nothing in the record demonstrates Branks' dissatisfaction with her counsel's efforts. Nor does Branks provide this Court with any declarations or documentation she believes should have been presented at her sentencing, or detail any instructions she gave counsel that were unmet.  Branks fails to demonstrate that counsel's decision to pursue the presentation of mitigation evidence as he did on Branks' behalf was an unreasonable professional judgment nor does she demonstrate his investigation of further, possible mitigating factors was inadequate. *See Strickland*, 466 U.S. at 699; *Wiggins v. Smith*, 539

U.S. 510, 521-23 (2003).

That Branks' prepared legitimate immigration petitions, a claim she made the Court aware of previously, does not support a likelihood she would have prevailed at trial. Even if this Court were to consider Branks' claim that additional evidence exists showing that a "significant number of the petitions" were "legitimately prepared," she provides none of that evidence here. (Doc. cv-15 at 8). Specifically, she fails to show that a significant number of the 272 asylum petitions were legitimate. Branks is attempting to escape the waiver provision of her plea agreement by claiming ineffective assistance of counsel in order to influence this Court to reevaluate her conduct to attain a lesser sentence. Nothing in her motion demonstrates there is a reasonable probability that this Court's decision would have been different if additional letters or witnesses had been presented.

Branks fails to address this Court's reasoning in fashioning the sentence, namely how her fraudulent petitions directly affected numerous aliens seeking asylum and how these falsehoods were directly responsible for the immigration authorities' having to review all of the petitions Branks prepared to determine if they were accurate. At sentencing, this Court told Branks that her prior good deeds and testimonials from some of her clients had swayed the decision to not impose the statutory maximum sentence. Even if Branks could produce additional documentation, it would not resolve this Court's concerns about the individuals seeking citizenship whose right to such relief is now foreclosed due to her actions.  Nor can she diminish the magnitude of the review the immigrations authorities had to undertake on every one of her petitions to check for accuracy.

Nothing in the record indicates this Court was unaware of Branks' claim that some of her work was legitimate. The Court, after considering all the sentencing factors and

advisory guidelines, chose a within guidelines sentence reflecting the damage Branks' actions had caused. Nothing in this claim undermines confidence in the veracity of Branks' admissions concerning the factual basis of the plea or this Court's fashioning of her sentence. Other than Branks' bald assertions, there is no evidence that her counsel was inadequate in his representation. Counsel was retained by Branks pre-indictment and communicated with her primarily through "phone conversations, text messages and e-mails." (Doc. cv-15 at 12). Counsel "spent several hours on two separate occasions reviewing all of the files in question." (Doc. cv-15 at 12). Branks' counsel obtained discovery, conducted client and witness interviews, and conducted research in the hope that such efforts would lead to a mitigation of her sentence. These efforts demonstrate adequacy of representation under the *Strickland* and *Hill* standards. The possibility of presenting additional witnesses or other documentation at sentencing in mitigation does not indicate that counsel's investigation was inadequate nor does it call into question whether counsel's advice to Branks' on whether to plead guilty was affected.

Nothing in this claim indicates Branks would have chosen to go to trial; instead it reveals that Branks' goal is to attain a lesser sentence and expresses her dissatisfaction with the sentence she received. Moreover, the Eleventh Circuit never has required that a plea agreement specify a particular guidelines range within which the defendant may anticipate being sentenced in order for a sentence appeal waiver to be enforceable. In any event, Branks is not be entitled to relief on the merits of her challenge even if she had not waived it.

As Branks cannot show any deficient performance by her counsel, it stands to reason that she cannot show any prejudice as a result of counsel's actions. Branks'

suggestion that she might not have pleaded guilty if she more fully understood the waivers or that her counsel's decision to present his mitigation arguments did not match her own view, or she did not agree with this Court's imposition of sentence is simply not enough to show prejudice. *See Tahamtani v. Lankford*, 846 F.2d 712, 714 (11th Cir. 1988); *Roach v. Roberts*, 373 Fed. App'x 983, 985 (11th Cir. 2010) ("A petitioner's bare allegation that he would not have pleaded guilty is insufficient to establish prejudice under *Strickland*"). Even if Branks had identified a deficiency in counsel's sentencing arguments, relief would not be warranted because her sentence does not exceed the statutory maximum term and would not support a prejudice finding under *Strickland*.

Ground two does not warrant relief.

## Ground Three

Petitioner's trial counsel was ineffective for failing to explain what she must do to obtain a substantial assistance reduction. More specifically, Petitioner's trial counsel failed to explain what, if any, assistance Petitioner would be able to provide to the government in order to receive the benefit of a substantial assistance sentence reduction. Furthermore, Petitioner's trial counsel failed to explain the form and manner in which Petitioner would have to provide said assistance to the government. Had Petitioner's trial counsel explained said aspects of the substantial assistance portion of Petitioner's plea agreement she would not have pled guilty and instead would have gone to trial. As such, Petitioner was overwhelmingly prejudiced by her trial counsel's failure to adequately explain said aspects of the substantial assistance portion of her plea agreement, and she is thereby entitled to have her guilty plea vacated.

This claim has no merit. Branks' plea agreement contains the following language regarding a possible sentence reduction based on substantial assistance:

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to

further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1 or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

(Doc. cr-8, p. 4-5 ¶ 6).

At the change of plea hearing, the Magistrate Judge fully explained paragraph six:

**THE COURT:** Paragraph six concerns cooperation.  In paragraph six you agree to cooperate fully and to testify, if necessary.  And in return for your cooperation, the government agrees to **consider** filing a motion saying that you have provided substantial assistance.

Now, in this case if the government does file a motion saying you have provided substantial assistance, that could benefit you by permitting the Court to depart down below whatever guideline range has been calculated. Do you understand how you could be benefitted if the government files such a motion?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Furthermore, if the government does file the motion, the Court could either deny the motion or give you less benefit than the government has recommended.  Do you understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** And if that should happen, you would not have a right to withdraw your plea of guilty.  Do you understand that?

**THE DEFENDANT:** Yes, sir.

**THE COURT:** Do you have any question about that provision?

**THE DEFENDANT:** No, sir.

(Doc. cr-31, pp. 29-31).

In her memorandum of law in support of the motion to vacate, Branks contends that her counsel was ineffective for failing to inform her of "immense amount of assistance she would be required to provide in order to receive the benefit of a government-filed Rule 35 motion."  She states that had he done so, she "would not have pled guilty and would have gone to trial."  She alleges that counsel materially misrepresented the consequences of her plea, citing *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985) and *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999).(Doc. cv-15 at 4).

*Smith* states "A lawyer's affirmative misrepresentation about the consequences of a guilty plea may, in some cases, fall below the wide range of professional competence.  But ultimately, '[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.'"  *Smith,* 170 F.3d at 1054 (citing *Strickland*, 466 U.S. at 688).  *Smith* also states that a district court need not conduct an evidentiary hearing if it can be conclusively determined from the record that the petition was not denied effective assistance of counsel.  *See Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982).

Branks' contention that she did not understand the cooperation aspects of her plea

27

agreement contradict her sworn statements to the Court and are not supported by anything other than her conclusory self-serving arguments. Branks cannot blame counsel for her continuing efforts to "excuse or minimize her involvement" in the conspiracy. (See Doc. cv-15 at 12 [Attorney Camareno's letter to Branks' present attorney, T. Federico Bower]). (See Exhibit 1 to this order.)  Attorney Camareno states, in his letter, "I was retained by Ms. Branks, pre-indictment.  I was never provided any formal discovery but as AUSA Toro-Font and the agents will confirm, we all spent several hours on two separate occasions reviewing all of the files in question.  During these two proffers, Ms. Branks made several admissions but would still excuse or minimize her involvement."

Nowhere does Branks state that she did not understand the Magistrate Judge's explanation of substantial assistance and nowhere does she state that her attorney could have told her exactly what substantial assistance was necessary for the government to move for a downward departure.

*Sullivan v. United States*

Branks cites *Sullivan v. United States*, 11 F.3d 573, 575-76 (6th Cir. 1993) in her memorandum of law supporting ground three. *Sullivan* stands for the proposition that the government should "affirmatively state on the record that whether petitioner has provided "substantial assistance" will be left to the government."   As set out above, the plea agreement affirmatively states on the record that whether Branks has provided "substantial assistance" will be left to the government.  Branks confirmed that she understood this fact at the change of plea hearing.

Nothing in ground three substantiates a claim of ineffective assistance of counsel for counsel's failing to explain to Branks what she was required to do to obtain a

28

"substantial assistance reduction."

Ground three does not warrant relief.

Accordingly, the Court orders:

That Branks'  28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence (Doc. cv-1; cr-29) is denied.  The Clerk is directed to enter judgment against Branks to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability because Defendant has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2). Nor will the Court authorize the Defendant to proceed on appeal in forma pauperis because such an appeal would not be taken in good faith. See 28 U.S.C. § 1915(a)(3). Defendant shall be required to pay the full amount of the appellate filing fee pursuant to § 1915(b)(1) and (2).

ORDERED at Tampa, Florida, on January 24, 2012.

*Virginia M. Hernandez Covington*

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Counsel of Record